Case 1:08-cr-00022   Document 1   Filed 09/12/2008   Page 1 of 6


FILED
Clerk
District Court

SEP 12 2008

For The Northern Mariana Islands
By_____
(Deputy Clerk)

# UNITED STATES DISTRICT COURT
# DISTRICT OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES of AMERICA,  <br><br>           Plaintiff,  <br><br>    v.  <br><br>SONG, Yong Ming  <br><br>           Defendant. | Case No.: **CR 08-00022**  <br><br>**COMPLAINT AND AFFIDAVIT**  <br><br>21 U.S.C. §§ 841(a)(1) and (b)(1)(B)  <br>Possession with Intent to Distribute a  <br>Controlled Substance  <br>(Count 1) |

On information and belief, as stated in the supporting Affidavit, the undersigned states:

## COUNT 1

(Possession with Intent to Distribute a Controlled Substance)

That on or about September 11, 2008, in the District of the Northern Mariana Islands, SONG, Yong Ming, the defendant, did knowingly and intentionally possess with intent to distribute a controlled substance, to wit, approximately 176.6 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B).

1

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, DANIEL HOLCOMB, a Special Agent with the Drug Enforcement Administration (DEA), after being duly sworn, depose and say as follows:

1. I am a Special Agent with the DEA and have been so employed for about nine and one-half years. I am assigned to the DEA's Saipan office, located in the Commonwealth of the Northern Mariana Islands. The following is based on my own investigation or was provided to me by other law enforcement officers who participated in and are familiar with this investigation.

2. On September 11, 2008, at approximately 10:40 p.m., Commonwealth of the Northern Mariana Islands (CNMI) Department of Public Safety (DPS) Sergeant (Sgt.) Anthony Macaranas and Officer (Ofc.) Daniel Punimata were operating a marked CNMI DPS patrol unit in the San Jose Village area on Saipan. While driving south on Beach Road, Sgt. Macaranas saw a white Toyota Corolla with CNMI license plate ACD-220 driving south on Beach Road in front of him. As traffic drove north on Beach Road past the white Toyota Corolla and Sgt. Macaranas' patrol unit, Sgt. Macaranas and Ofc. Punimata could see that the driver of the white Toyota Corolla was not wearing his seat belt. As the white Toyota Corolla entered the Susupe area on Beach Road, Sgt. Macaranas activated the emergency equipment on his patrol car and stopped the vehicle. As Sgt. Macaranas stopped the vehicle, he and Ofc. Punimata could see the driver of the white Toyota Corolla trying to put on his seat belt.

3. Sgt. Macaranas and Ofc. Punimata then approached the driver's side of the white Toyota Corolla, where they saw a Chinese male, later identified by his driver's license as SONG, Yong Ming, sitting in the driver's seat. Ofc. Punimata identified himself to SONG and advised SONG of the reason for the traffic stop. Ofc. Punimata asked SONG for his driver's license, registration and proof of insurance. As SONG reached for the requested documents, Ofc. Punimata could see that SONG was sweating and his hands were noticeably shaking. As

SONG handed his driver's license to Ofc. Punimata, Ofc. Punimata noted that his hand continued to shake.

4. When Ofc. Punimata took SONG's driver's license from him, he smelled a strong odor of alcohol on SONG's breath. Ofc. Punimata asked SONG if he had been drinking that night, and SONG stated, "Yes." Ofc. Punimata then asked SONG to step out of the vehicle and walk back to the patrol car. When SONG stepped out of the vehicle, Ofc. Punimata and Sgt. Macaranas noted that SONG appeared unsteady on his feet, and his hands continued to shake.

5. Ofc. Punimata told SONG to relax and stand against the hood of the patrol car. Ofc. Punimata asked SONG why he was so nervous and shaking. SONG did not answer the question. Ofc. Punimata then asked SONG if he was nervous, and SONG said, "Yes," and nodded his head. Sgt. Macaranas then asked SONG if he had anything illegal in the vehicle, and if that was what was making him nervous. SONG shook his head and said, "No." Ofc. Punimata then asked SONG if they could look in his vehicle for contraband. SONG nodded his head and said, "Yes."

6. When Ofc. Punimata and Sgt. Macaranas looked inside SONG's vehicle, they saw a large pink plastic bag with a red and gray duffle bag inside of it. Ofc. Punimata and Sgt. Macaranas removed the plastic bag from the vehicle and set it on the trunk of SONG's vehicle. Ofc. Punimata asked SONG if the bag belonged to him. SONG said, "No," and he told Ofc. Punimata that he picked up the bag a few minutes ago for a friend in China. Sgt. Macaranas then asked SONG if the bag contained anything illegal, and SONG shrugged his shoulders. Ofc. Punimata then asked SONG if he could look inside the bag. SONG said, "Yes," and he nodded his head.

7. Ofc. Punimata then noted that the bag had a small gold padlock on the zipper, so Ofc. Punimata "popped" the zipper of the bag using a Gerber tool. When Ofc. Punimata looked inside the bag, he found three (3) Oil of Olay soap boxes that had been opened and then taped shut. Ofc. Punimata then opened the Oil of Olay boxes and found a total of fifteen (15)

small ziplock bags that each contained a foil package that had a crushed, glass-like substance inside of it. Based on his training and experience, Ofc. Punimata recognized the crushed, glass-like substance as methamphetamine.

8.    Ofc. Punimata asked SONG if he recognized the crushed, glass-like substance inside the bag, and SONG shrugged his shoulders. Ofc. Punimata and Sgt. Macaranas then placed SONG under arrest. Shortly after arresting SONG, Ofc. Punimata contacted Sgt. Alfred Celes, who is the supervisor of the CNMI DPS Narcotics Unit. Sgt. Celes asked Ofc. Punimata to transport SONG to a pre-arranged location for an interview.

9.    At approximately 11:10 p.m., Sgt. Celes arrived at the pre-arranged location, where he met Ofc. Punimata, Sgt Macaranas and SONG. Sgt. Celes inspected the methamphetamine, and he asked SONG if he wanted to talk to law enforcement officers about the drugs. SONG said, "Yes," and Sgt. Celes contacted SA Daniel Holcomb of the DEA for assistance.

10.   At approximately 11:20 p.m., SA Holcomb and SA Michael Byerley arrived at the pre-arranged location accompanied by a Mandarin dialect interpreter. SA Holcomb and SA Byerley identified themselves to SONG, and SA Holcomb read SONG his Miranda Warning through the interpreter. SONG stated that he understood the Miranda Warning, and he that he wanted to answer questions.

11.   SONG stated that he received a telephone call at approximately 7:00 p.m. from a friend in China, who asked SONG to pick up a package for him. SONG identified his friend in China as "CHEN," and he stated that he has known CHEN for several years. SONG stated that CHEN initially instructed him to go to the Price Costco parking lot to pickup the package. SONG stated that he went to the Price Costco parking lot a little while later, but he could not find the package. SONG stated that when he could not find the package, he went home.

12.   SONG stated that shortly after he went home, CHEN called him again and instructed him to go to the bus stop, located on Beach Road at the intersection of Quartermaster Road, to pickup the package. SONG stated that he thought it was suspicious that CHEN

wanted him to pickup a package late in the evening at a bus stop, but he owed CHEN money, so he agreed to do it. SONG stated that CHEN told him that after he picked up the package, he needed to take it to his house, where someone else would come get it later. SONG said that he became more suspicious of CHEN's request to pickup the package, because CHEN continued to call him and was extremely insistent that SONG get the package immediately.

13. SONG stated that he then drove to the bus stop, where he found the package under the bench. SONG stated that when he picked up the package, he believed that it contained something "illegal or hazardous," but he still picked it up because he owed CHEN money. SONG stated that he was hesitant to leave with the package, because he thought he was doing something illegal, but he did so anyway because of the debt he owed CHEN. SONG then stated that he owed CHEN money because after he (SONG) got out of jail in the CNMI, CHEN lent him money and gave him a job repairing cars at a garment factory.

14. SA Holcomb then searched SONG's wallet and located two Western Union receipts dated September 9, 2008, and September 10, 2008, and several hundred dollars. Both of the Western Union receipts indicated that SONG wired $5000 of U.S. Currency to China on each day. SONG admitted to making the wire transfers, but stated that he sent the money to his in-laws in China. SONG stated that he won the money on two separate days gambling at two different poker businesses (**Note:** According to the CNMI Department of Finance, the maximum payout on most poker machines on Saipan is capped at $1000). SA Holcomb asked SONG why he could not pay CHEN the money he owed him if he was just in possession of $10,000 in U.S. Currency, and why he did not send the money he had to CHEN to satisfy his debt. When SA Holcomb asked SONG this question, SONG only shrugged his shoulders. Based on SA Holcomb's training and experience, he identified SONG's wire transfer activities as consistent with that of "smurfing," which is an attempt to conduct multiple wire transfers of money under $10,000 to avoid mandatory Federal currency transaction reporting requirements. Based on SA Holcomb's training and experience, he knows that "smurfing" is a common method used by drug traffickers to smuggle drug trafficking proceeds out of the United States.

15. While SA Holcomb interviewed SONG, other officers searched SONG's vehicle. Inside SONG's vehicle, officers located a small, black Chinese-English dictionary in the center console of the vehicle. When they opened the dictionary, they found that the pages inside of it had been cut out in a rectangle equivalent in size to the packages of methamphetamine found inside the bag in SONG's car. Officers also found a partially empty water bottle in the center console. Based on SA Holcomb's training and experience, he knows that methamphetamine traffickers frequently carry partially empty water bottles near their drugs, so they can dump the drugs inside the water bottle before they are discovered by law enforcement officers.

16. SA Holcomb then placed SONG under arrest and transported him to the CNMI Department of Corrections. SA Byerley transported the drugs to the Saipan DEA office, where he conducted a field test on the drugs and weighed them. The drugs weighed approximately 176.6 grams, and they tested positive for methamphetamine.

17. Based on the foregoing information, there is probable cause to believe that SONG has violated 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

_____
DANIEL G. HOLCOMB, Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me this 12th day of September, 2008.

_____
ALEX R. MUNSON
UNITED STATES DISTRICT COURT JUDGE